**KEUFFEL & ESSER COMPANY**
**v.**
**MASBACK, Inc., Evans & Co. (Inc.) Material Process Co., Private Brand Rule Co., and Sears, Roebuck and Co.**

**KEUFFEL & ESSER COMPANY**
**v.**
**SEARS, ROEBUCK AND CO.**

United States District Court
S. D. New York.
Nov. 17, 1954.

Kenyon & Kenyon, New York City, for plaintiff. Ralph L. Chappell, George T. Bean, John A. Reilly, New York City, J. Russell Juten, Washington, D. C., of counsel.

Fish, Richardson & Neave, New York City, for defendants. John Vaughan Groner, Stuart A. White, New York City, of counsel.

CONGER, Justice.

These are actions for the infringement of patents.

No. 61–251 was filed in this Court on October 11, 1950, the complaint alleging that white painted metal measuring tapes made by Evans & Co., and sold by its customer, Masback, Inc., infringed patent No. 2,089,209 (hereafter designated as 209).

No. 78–77 was originally commenced in the District Court in Dalles, Texas on patent 209, two other patents not now involved in this suit and patent No. 2,471,329 (hereafter designated as 329) against Sears, Roebuck and Co., a seller of Evans tapes. On motion of defendant, the suit was transferred to this Court.

Thereafter, by stipulation and order both actions were consolidated for trial and Private Brand Rule Co., a subsidiary of Evans, and Material Process Co., a manufacturing affiliate, were permitted to join as parties defendant in the original suit. Evans had appeared voluntarily although not amenable to process here.

By pre-trial stipulation the plaintiff limited its complaint to infringement by all defendants of claims 3, 9, 10, 14, 15, 16 and 17 of patent 209 and to infringement by Material Process Co. and Sears of both claims (1 and 2) of Patent 329.

Except for Sears, infringement is conceded by the defendants and with respect to Sears, the plaintiff does not urge infringement of 329.

Therefore, the only issues are the validity of the two patents.

Patent 209 was issued August 10, 1937, upon application, dated September 19, 1933, of Adolf W. Keuffel and Walter Gotham. It was thereafter assigned to plaintiff. It "relates to measuring tapes, rules and other scales of the kind used by engineers and surveyors * * * and others to measure distances * * * (and) is particularly suitable for a steel measuring tape."

The patent recites the weaknesses of prior art measuring tapes, which were made of woven fabric or of steel ribbon. The fabric tapes tended to inaccuracy because of stretching and soon wore out. The steel tapes tended to rust, which obscured the indicia. Further, the indicia were created by an etching process the effect of which was to weaken the tape alongside the indicia so that etched tapes tended to break at such a point after some use. Electroplating was thought to remedy the objections found in the etched tape, but experience proved that the commonly used metal, nickel, offered practically no contrast between the indicia and the background.

The plaintiff's tape was a successful attempt to overcome the infirmities of the prior art tapes. There appears to be no dispute about this. Defendants concede their superiority over etched tapes in every respect and Mr. Goldman, vice-president of Evans, testified, in effect, that their visibility rendered them superior to an electro-plated tape, which his company does not make.

The claims of 209 relied upon read as follows:

"3. A measuring tape comprising a strip of metal, a ground coat on the surface thereof forming a background, graduations of a contrasting color imprinted on said coat with a composition adapted to bite in and embed itself in the ground coat and a top coat over the mark-

ings and ground coat which when applied comprised solvents, which are non-solvents of the ground coat or printing composition.

"9. A measuring tape comprising a strip of metal the surface of which has been treated to cause it to be receptive to a ground coat, a flexible pigmented ground coat applied to the receptive surface of the metal, graduations printed on said ground coat and a protective transparent top coat overlying the graduations and ground coat.

"10. A measuring tape comprising a strip of metal the surface of which has been treated to cause it to be adherent to an enamel coating, a ground coat of flexible enamel applied to the surface of the steel tape, graduations printed thereon and a protective top coat superimposed on the graduations and ground coat.

"14. A highly legible graduated metal measuring tape, having greater initial legibility under normal light conditions, more resistance to wear in use, higher resistance to corrosion and higher tensile strength than an etched tape made from the same metal base, comprising a flexible metal strip coated with a pigmented flexible base coating having contrasting colored graduations and numerals thereon.

"15. A highly legible graduated metal measuring tape, having greater tensile strength, twisted tension strength and bending strength than an etched tape made from the same metal base comprising a flexible metal strip coated on both sides with a pigmented flexible base coating and having contrasting graduations thereon.

"16. A highly legible graduated steel measuring tape which remains legible in use and resists corrosion comprising a steel strip rustproofed and coated with a pigmented flexible base coating having contrasting graduations thereon and an overcoat of a clear coating composition.

"17. A measuring tape comprising a flexible strip of metal, a flexible coating of a pigmented finishing composition on a surface thereof forming a background, markings representing a scale imprinted on said background in a color contrasting therewith and numerals representing at least units of lineal measure imprinted on said background in a color contrasting with the background."

The patent specifies the process as follows (diagram numbers being omitted from the text):

"The surface of the strip is first prepared by a suitable process to cause it to be more receptive to the coating. In the case of steel, this not only gives a rustproof finish to the surface of the steel, but also prepares the steel so that a subsequent finish, such as an enamel, will be able to firmly bond or adhere to the surface of the steel. * * * In the preferred embodiment, as now practiced, a pigmented composition, such as enamel, preferably white, is applied to the prepared metal strip. This first coating we designate as the ground coat.

"After the ground coat has dried, the indicia graduations and numbers are then printed on the ground coat by means of the transfer of a special printing ink from dies in such a way that the graduations formed on the tape may be the exact length. The ink, which we prefer to use, has the property of biting in and embedding itself in the ground coat and yet is not softened or attacked by the solvents of the top coating and thus the distortion and shifting of the graduations is prevented during manufacture. The printing dies force the ink forming the characters into the ground coat, to some extent at least. It is desirable that the indicia be embedded in the ground coat so that the surface of the ink markings and the surface of the ground coat lie in substantially one

plane and present a smooth surface without projections formed by the ink of the impressions. Thus where the indicia are impressed by dies, decalcomania, etc., the ink may be permitted to dry to a predetermined degree, then preferably heated to a predetermined degree, and then the imprinted tape subjected to pressure as by being passed between pressure rollers.

"A top coating of a clear transparent type is then applied over the facing comprised of the ground coat and indicia to protect the printed graduations and the numbers, and in this way a wear-resisting finish is applied to the tape."

Two types of materials may be interchangeably used as top coat and ground coat: 1. "A synthetic type composition consisting of a phenol-formaldehyde and glyptal modification"; and 2. "A composition comprising cellulose esters and/or acetates." It is suggested as most practical to use type No. 1 as the ground coat and type No. 2 as the top coat. In either case the ground coat is pigmented and the top coat transparent.

Mr. Keuffel, vice-president of the plaintiff and one of the co-patentees of 209, testified to his long experience with measuring tapes, dating back to 1913, which experience channelled his thoughts to improvements in the unsatisfactory prior art tapes and led him to the coated tape. He subjected the coated tapes to various tests including erasure and drawing the tapes underfoot on a concrete floor in order to determine their resistance to abrasion. He was discouraged by the results of these tests but he subjected the tapes to further testing including dragging behind an automobile and was encouraged to find good indications of their resistance. The tapes were given out to engineers for use, some made in alternate sections of coated and etched tape and the results of such usage influenced the plaintiff to market them in 1935 with an absolute guarantee.

In 1925, Hiram A. Farrand had said in his Patent 1,828,401 for an electroplated tape that "Ordinary protective coatings are not adaptable, in that, such coatings have insufficient adhesion to remain unaffected during the severe bending to which these springs are subjected. Also, the abrasive effect of rubbing along the surface of the spring holders when coiling, is apt to remove any ordinary coating such as lacquer, varnish or other adhesive."

Despite Farrand's notion, Keuffel's work culminated in the white coated tape, which undoubtedly fulfilled a long-felt need of those using tapes for a device free of the deficiencies of the prior art tapes.

Admittedly, there is no novelty in steel tape, nor in rust-proofing it. The novelty of 209 lies, it is said, in the use and combination of a flexible strip with a coating not itself resistant to applied abrasives (eraser, for example) but which, nevertheless, in its proper use, unexpectedly and contrary to the prior art teaching, maintains a superior degree of resistance to occupational abrasion.

As indicated heretofore, there is no suggestion on the part of defendants that the coated tape is anything less than the superior product claimed by plaintiff. Evans makes it exclusively and is the largest producer in the world. I emphasize this because of the plaintiff's efforts in the course of trial to show the many wonders of its tape even though defendants made no issue of it.

The defendants do contend, however, despite the admitted efficiency of the coated tape, that it is simply not invention. Their principal reason for so saying is that plaintiff merely took advantage of the improvement in paints, which it is said occurred for commercial purposes in 1929.

Both Dr. Givens and Mr. Bragdon, defendants' experts, testified to the appearance on the market in 1929 of phenol aldehyde resin varnishes and glyptal varnishes which, they said, represented great advances, from the standpoints of

flexibility and adherence, over the paints previously available. They opined that the paints available prior to 1929— natural resins, nitrocellulose lacquers and the early phenols—would not have been satisfactory for a flexible article such as a steel measuring tape. Dr. Mantell, plaintiff's expert, confirmed the period of the appearance of the new synthetic resins, but he disagreed in effect with the thinking that they were essential to a successful coated tape. ·As a matter of fact, Dr. Mantell said that in his opinion " * * * it would have been possible to make a satisfactory tape with the knowledge then available and with the materials at hand." Among such materials were the natural resins, drying and non-drying oils, a small group of synthetic resin material pigments, plasticizers, solvents and nitrocellulose materials. Confining himself to those materials, he recently produced, and the plaintiff put in evidence, coated tapes which he claimed would be satisfactory commercial tapes. One was made from natural resins, the second from the Arsem resin (Patent No. 1,098,777) and the third from nitrocellulose shellac.

It is, therefore, necessary to resolve the problem raised by the opinions of Dr. Given and Mr. Bragdon as against that of Dr. Mantell and his productions.

One of the co-patentees of the 209 patent, Walter Gotham, testified that he went to work for Roxalin Flexible Lacquer Company in 1930 or 1931 as a sales service engineer; that at the time he knew "nothing in particular" about the manufacture of paints and lacquers but that most of his selling was done on an engineering basis so that whatever he had to know about paints came afterwards. Sometime after such employment commenced, possibly in 1932, he began to do some work with Mr. Keuffel in connection with steel measuring tapes. His work was concerned with determining which Roxalin paints and lacquers were satisfactory to a steel tape. Many Roxalin products were applied, subjected to tests, modified to overcome deficiencies such as increasing the bond, for example,

until the tape was thought satisfactory. In other words, Gotham's job was simply to find the Roxalin product—standard materials—that covered the K & E tape.

Mr. Keuffel had been trying since 1929 to produce a white coated steel tape but he had been unsuccessful. In his examination before trial he testified:

"Q. Now we can go back to the factors again: In the period from the time you started work on these tapes up to November 3, 1932, what did you find with respect to the ground coat as to its abrasive resistance? A. Again from memory I would say that it was not developed so that it would be satisfactory for us to use as an article to be placed on the market.

"Q. And you were unable up to that date to find any paint manufacturer who could give you a lacquer which did have the abrasive resistance qualities which you demanded? A. From memory I would say that is correct.

"Q. Now I will ask you exactly the same question with respect to resistance to flexing. Remember we are speaking of the pre-November 1932 period. A. With regard to resistance to flexing I am quite sure that we had a satisfactory material available.

"Q. Now the final factor, and I ask you the same question again with respect to the resistance to rusting. A. As to resistance to rusting I am quite sure we did not have a satisfactory product.

"Q. And you were unable to find during that period a paint manufacturer who could make a lacquer which did have satisfactory resistance to rusting? A. I do not recall that we approached various manufacturers.

"Q. In any event, you did not find it? A. No, we did not find it.

"Q. So that in the period up to November 3, 1932 you found some difficulty in the legibility bracket in

that the colors did not stand up to weather and salt spray; some in resistance to adherence, and some failure to show proper abrasive resistance, and some failure to show proper resistance to rusting? A. Yes."

On November 3, 1932, Mr. Keuffel filed an application (No. 641,034) for a coated tape which was subsequently abandoned.

It was not until 1933 that he and Gotham found a proper paint for the steel tape and it was not one of those used by Dr. Mantell in his productions.

How, therefore, may the plaintiff claim that its 209 patent represented invention? Gotham admittedly invented nothing. He created no custom paint nor did Roxalin. Gotham merely brought to Keuffel various paints from the Roxalin inventory and lent his aid in determining which ones were satisfactory. As a matter of fact, Gotham said he did not know why he was "so honored" with credit for co-invention of the 209. Keuffel knew all about steel tapes but he knew nothing about paints and had no hand in their compounding.

In Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 328, 65 S.Ct. 647, 650, 89 L.Ed. 973, the Supreme Court said:

"He who is merely the first to utilize the existing fund of public knowledge for new and obvious purposes must be satisfied with whatever fame, personal satisfaction or commercial success he may be able to achieve. Patent monopolies, with all their significant economic and social consequences, are not reserved for those who contribute so insubstantially to that fund of public knowledge."

Dr. Given testified that a man skilled in the paint art could have prescribed the constituents making up a successful coated tape in 1930 "perhaps not the very first trial but he might have by the second or third."

It seems to me that Dr. Given expressed a probability that actually occurred in the production of plaintiff's tape. Keuffel consulted the paint man who brought over his collection of paints and through experimentation the two arrived at the proper materials for completing a satisfactory tape. Obviously, they used more time and effort than thought by Dr. Given but these are relative factors which may be influenced by the ability of the consultant, the quality of the experimentation and the methods of production, for example. Possibly, Dr. Given's estimate is optimistic or, on the other hand, not so for one of his ability or that of Bragdon or Dr. Mantell.

I believe the expression of the Court in Dow Chemical Co. v. Halliburton Oil Well Cementing Co., supra, is perfectly applicable to the circumstances. Keuffel and Gotham were merely the first to use the existing improvements in paints on a tape measure and for this they are not entitled to a patent. The efforts of Keuffel and later with Gotham along with the views of Given and Bragdon suggest that Dr. Mantell was unique in fashioning the pre-1929 paints.

 In my view, the defendants have carried the burden of establishing the invalidity of patent 209. 35 U.S.C. § 282.

Defendants have cited Hemming No. 1,999,413 and Parker No. 1,802,033 against patent 209, but in view of the above disposition it is unnecessary to consider them.

Patent 329 was issued May 24, 1949, upon application dated September 4, 1948 of Adolf W. Keuffel. It was thereafter assigned to plaintiff.

This patent relates to a "method for making a coated metal measuring tape." It repeats pro tanto almost the same recitation of the 209 patent. It has two claims which read as follows:

"1. The method for making a coated metal measuring tape which comprises preparing a metal strip to receive a coating composition, passing the strip in contact with a roller which carries and applies to the strip a pigmented coating composition comprising a synthetic resin which

will set while retaining its elasticity, passing the coated metal strip through a heated zone to remove the solvents permanently and set the coating, and applying indicia comprising numerals and graduations to the coated metal strip with an ink which will firmly bond with the coating.

"2. The method for making a coated metal measuring tape which comprises preparing a metal strip to receive a coating composition, passing the strip in contact with a roller which carries and applies to the strip a pigmented coating composition comprising a synthetic resin which will set while retaining its elasticity, passing the coated metal strip through a heated zone to remove the solvents and permanently set the coating, applying indicia comprising numerals and graduations to the coated metal strip with an ink which will firmly bond with the coating and applying a top coat of a transparent coating composition to the printed coated strip."

Evidently plaintiff relies solely upon the presumption of validity to sustain 329 for it made no attempt to show novelty.

The defendants contend that 329 is anticipated by Hemming and Parker and by plaintiff's 209 patent.

Patent 329 discloses the following steps:

1. "preparing a metal strip to receive a coating composition";

2. "passing the strip in contact with a roller which carries and applies to the strip a pigmented coating composition comprising a synthetic resin which will set while retaining its elasticity";

3. "passing the coated metal strip through a heated zone to remove the solvents and permanently set the coating";

4. "applying indicia comprising numerals and graduations to the coated metal strip with an ink which will firmly bond with the coating;"

5. "applying a top coat of a transparent coating composition to the printed coated strip".

A comparison of Hemming and Parker with the foregoing steps discloses the following:

| Hemming | Parker |
|---|---|
| Step 1 "a clear metal surface which has been scuffed" | "metal is treated in a continuous manner during the process of cleaning and preparing it" |
| Step 2 "a pigmented ground coat was applied by roller coating" | "metal passes to a coater device 6 which applies a coating to the metal" |
| Step 3 Hemming applies no heat in this step but rather permits the ground coat to air dry until it reaches a tacky state | "metal passes to an oven" |
| Step 4 "applies decalcomania which is firmly anchored to the surface to be decorated" | "[coated] metal can have indicia applied thereto in various ways, such as lithographing, printing" |
| Step 5 "a clear top coat is applied to the decorated surface" | "metal passes into a varnisher" |

Dr. Given testified that the method of 329 is contained in both Hemming and Parker.

Actually, neither Hemming nor Parker applies to a steel tape but rather to metal decoration. There is also some variance

in the steps, particularly Hemming's third. Essentially, however, they are both methods of roller coating metal which is all that is contained in 329. It seems most improbable that a person in the art given the materials of the coated tape, would have difficulty in arranging the method of 329 having Hemming and Parker in mind.

Dr. Mantell testified on cross-examination as follows:

"Q. I gather from your testimony on direct that in, say, 1930, it was established practice to prepare a metal surface for the reception of paint—A. Yes.

"Q. (Continuing) And to then apply a coating of paint, for example, by roller coating. A. Yes, I believe so.

"Q. And by 1930 that coating might have been either a glyptal or a phenol or both, is that not correct? A. By phenol you mean a general phenol alkyd resin, and by glyptal you mean an aldehyde-type resin?

"Q. Yes. A. Yes.

"Q. And it was also established practice at that time to heat-dry? A. Yes.

"Q. And to print on the base coat that we have just talked of? A. Yes, if it was in the lithographic art, that is typical, that is true.

"Q. And you would use an ink in doing so that bit in, would you not? A. You would at least use an ink that had adhesion and would tend to bite in.

"Q. And you would heat-dry that? A. You might or might not, but you could.

"Q. If it was necessary, you could? A. Yes.

"Q. And you could thereafter apply a coat of transparent material as a protective layer over a printed ground coat? A. Yes.

"Q. And then heat-dry that if it was necessary? A. Yes.

"Q. And all of that was established practice by 1930? A. Yes.

"Q. And it was applied to a multitude of products? A. Yes.

"Q. And it was applied in the sequence in which I set forth these steps to you? A. Yes."

The plaintiff points out that Dr. Mantell had the metal decorating art in mind when he made these responses. But it seems to me a distinction of little significance. Metal coating is the art contemplated by Dr. Mantell, Hemming, Parker and 329 and it required no inventive genius to modify the method for application to plaintiff's tape.

There is some question whether plaintiff's 209 anticipates its 329. There is no doubt of it in *fact* unless the plaintiff is entitled to the benefit of the rule with respect to co-pending applications by the same inventor. See Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 1927, 22 F.2d 259.

■ Patent 329 was applied for on September 4, 1948 as a division of a co-pending application dated November 11, 1942 (issued as No. 2,471,395 on May 24, 1949), which was a division of a co-pending application dated August 7, 1937 (issued as No. 2,303,368 on December 1, 1942), which was a continuation of patent 209. In this sequence, 395, of which 329 was a division, was filed prior to the issuance of 368, which continued 209. Whatever significance may be attributed to these circumstances disappears in view of the Patent Office's ruling that 329 and 209 were not co-pending applications. Plaintiff did not contest this ruling and it may not now assert what it surrendered. Exhibit Supply Co. v. Ace Patents Corp., 315 U. S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736. I hold that 209 anticipates 329.

■ The defendants have carried the burden of establishing the invalidity of 329. 35 U.S.C. § 282.

This opinion shall constitute the findings of fact and conclusions of law.

Settle an order for judgment in accordance with the foregoing.